UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

DAVID OQUENDO, JR.,                    )
*Administrator of the Estate of* David )
Oquendo, *et al.*,                     )
                                       )        No. 7:23-cv-40-REW-EBA
        Plaintiffs,                    )
v.                                     )        OPINION & ORDER
                                       )
UNITED STATES OF AMERICA,              )
                                       )
        Defendant.                     )

                    *** *** *** ***

Former USP Big Sandy inmates David Oquendo,[1] Robert Orth, and Tremaine Weekly initiated the present suit against the United States under the Federal Tort Claims Act (FTCA). *See* DE 23 (Am. Comp.). Before the Court is the United States's partial motion to dismiss DE 23 for lack of subject matter jurisdiction, or, alternatively, for failure to state a claim. *See* DE 39 (Second Motion to Dismiss). For the following reasons, the Court **GRANTS in part** and **DENIES in part** DE 39.

## I. BACKGROUND

### A. Factual Background

The Amended Complaint sets forth an exhaustive list of abuses and wrongs allegedly carried out by Big Sandy staff against Plaintiffs while they were inmates at the prison. The Court addresses each individual plaintiff's allegations, focused on the pleading text, in turn.

---

[1] Oquendo was a plaintiff in this action prior his passing in September 2023, at which point he was substituted as a party by his son, David Oquendo Jr., in his capacity as Administrator of the Estate of David Oquendo. *See* DE 37; DE 38.

1.    **David Oquendo**

On November 6, 2020, Oquendo experienced a medical seizure in his cell.  DE 23 ¶ 31.  When Oquendo's cellmate called for help, at least three officers "entered Oquendo's cell, beat Oquendo, handcuffed him[,] and dragged him out of his cell."  *Id.* ¶ 33.  Oquendo was then transferred to a hospital, where he awoke "with bruises on his head and broken blood vessels in his eyes."  *Id.*  The next day, an officer told Oquendo to "keep [his] mouth shut or next time [they] would 'f*** [him] up bad.'"  *Id.* ¶ 34 (alterations in original).  Officers also "laughed and taunted" Oquendo about the seizure and beating.  *See id.* ¶ 35.

On January 15, 2021, Oquendo began having another seizure in his cell.  *Id.* ¶ 36.  Once again, Oquendo's cellmate called for help, and once again, three officers "entered the cell and beat Oquendo, including by slamming his head to the ground and kicking and stomping on him."  *Id.* ¶¶ 37–38.  Oquendo was then moved to the Special Housing Unit (SHU), where "additional officers assaulted Oquendo" while he laid face-down on the floor, unable to breath, and "with someone on his back."  *Id.* ¶ 39.  Despite the presence of "an open wound on his forehead, Oquendo was put into four-point restraints" for an unspecified period of time before being transferred to an outside hospital.  *See id.* ¶¶ 42–43.  There, Oquendo "was diagnosed with a concussion, post-concussion syndrome, an epidural hematoma, acute kidney injury, and renal failure."  *Id.* ¶ 45.

In use-of-force memos discussing the two incidents, officers stated that Oquendo acted "combative" and that his "continued 'disruptive behavior'" necessitated that officers place him on the ground "utilizing the least amount of force necessary."  *See id.* ¶¶ 114, 110–14.  A subsequent BOP investigation concluded that "[r]ecords and interviews with staff reveal guidelines were appropriately followed and do not support negligence by staff."  *Id.* ¶ 112.

2

Due to the injuries he suffered on January 15, Oquendo remained at an external hospital for four weeks while receiving dialysis treatment. *See id.* ¶ 45. During this time, the Big Sandy officers who were assigned to monitor Oquendo allegedly participated in the following abuses:

- For the first week of Oquendo's stay, officers "secured his handcuffs and leg irons so tightly that they were cutting into Oquendo's skin." *Id.* ¶ 47. This was despite Oquendo's repeated pleas to loosen the cuffs. *Id.*

- Officers refused to provide Oquendo with water. As a result, he "was forced to wait until a nurse visited his room to request water, often leaving Oquendo with no water to drink for hours on end." *Id.* ¶ 49. At one point, an officer took Oquendo's call button and refused to give it back until a nurse instructed him to do so. *Id.* ¶ 50.

- Officers frequently refused to allow Oquendo to use the bathroom, including during a two-week period in which he was suffering from diarrhea. *See id.* ¶¶ 51–52. As a result, "Oquendo was forced to defecate on himself twice and urinate on himself multiple times." *Id.* ¶ 53. He was also "only allowed to take four showers" during his four-week stay. *Id.* ¶ 54.

- Other than his infrequent bathroom visits, Oquendo was kept chained to his bed for the entire duration of his stay, despite nurses' pleas to allow him "to walk around or at least stand up and stretch." *Id.* ¶ 55.

- When Oquendo told nurses that prison staff had assaulted him on January 15, monitoring officers threatened him and "told him they were going to make sure he died." *Id.* ¶¶ 56–57. This "caused Oquendo's heart rate to spike" enough to trigger a bedside alarm. *Id.* ¶ 57. Officers also made frequent jokes about the overtime pay they would earn from monitoring Oquendo. *See id.* ¶¶ 59–62.

After being discharged from the hospital, Oquendo returned to USP Big Sandy on February 12, 2021, where he was quickly transferred to the SHU without explanation. *See id.* ¶¶ 63, 70. There, officers continued to threaten and taunt Oquendo, with one officer commenting "that if he caused problems, next time they would make sure he stayed dead." *Id.* ¶¶ 67, 66–69. Officers also mocked Oquendo's injuries, admitted to carrying out the assault, and refused to provide Oquendo with necessary follow-up medical care for months. *See id.* ¶¶ 78–79, 81–88.

When Oquendo was finally released from the SHU on March 11, 2021, he attempted to write "a letter to his family [and counsel] explaining what happened to him and why he had been

out of touch for nearly two months." *Id.* ¶ 70.  Officers, however, intercepted the letter and falsely "wrote Oquendo up for 'threatening bodily harm' based on [the letter's] contents." *See id.* ¶ 71. Officers further mocked Oquendo's "fancy New York lawyers," *id.* ¶ 76, and threatened Oquendo when he tried to contest the fabricated write-up.  *Id.* ¶ 74.  The false report resulted in Oquendo losing "27 days of good time, access to the commissary, and access to email."  *Id.* ¶ 75.

On July 29, 2021, Oquendo was again sent to the SHU after an officer, while searching Oquendo's cell, "ripped a piece of metal off of a locker with a screwdriver and insisted it was a weapon" belonging to Oquendo.  *See id.* ¶¶ 89–91.  In the SHU, officers placed Oquendo with a "mentally unstable" cellmate who was "known for causing fights."  *Id.* ¶ 94.  On August 12, 2021, officers responded to a fight between Oquendo and the cellmate "by shooting Oquendo multiple times with a 68 caliber OC dispensing launcher and using pepper spray on Oquendo."  *Id.* ¶ 96. Officers then "pulled [Oquendo] out of his cell and [one officer] told him to 'get on his f***ing knees' or else he'd 'bust Oquendo's head open again.'"  *Id.* ¶ 98 (alterations cleaned up).  Although the fight had stopped as soon as staff began to respond, officers falsely reported "that Oquendo and the other inmate would not stop fighting until they were shot repeatedly" with OC and pepper spray.  *Id.* ¶ 97.  This report resulted in another 27 days of lost good time.  *See id.* ¶ 101.

On December 2, 2021, Oquendo was sent to the SHU yet again after officers found "homemade weapons" in the locker of Oquendo's cellmate.  *See id.* ¶ 102.  Although the cellmate claimed full responsibility for the weapons, the searching officer informed Oquendo he was being sent to the SHU anyway "as a 'Christmas gift.'"  *Id.* ¶ 103.  In the SHU, Oquendo was given a cell that had only "half a mattress," lacked a working shower, and was "filled with trash."  *See id.* ¶¶ 106–107.  Officers ignored Oquendo's requests for a new cell and told him "that he knew what he needed to do to 'get out,'" implying that Oquendo would have to fight with the other inmate in

his cell." *Id.* ¶ 107.  Oquendo was eventually transferred back to general population in "mid-December" and the charges precipitating his SHU placement were dismissed. *See id.* ¶ 108.

### 2. Robert Orth

On December 11, 2020, officers observed Orth and his cellmate passing items to other cells via the prohibited process of "fishing." *See id.* ¶ 118.  Officers ordered the inmates to cease this conduct and placed them in handcuffs without issue. *See id.*  At that point, "without provocation or justification," the officers radio-reported an ongoing staff assault, entered the cell, and slammed Orth's cellmate to the ground. *Id.*  Additional arriving officers then "grabbed Orth, punched him, slammed his face into the windowsill of his cell, and then slammed him to the ground." *Id.* ¶ 121. This caused heavy bleeding and "a deep cut on [Orth's] face" that required nine stitches. *Id.* ¶¶ 122, 124.  Officers then walked Orth to the SHU, where he was forcibly stripped and placed in ambulatory restraints. *See id.* ¶¶ 125–26.  Orth remained in this position "for hours" while blood dripped from his cut directly into his eye. *Id.* ¶ 127.  When officers ignored his continued requests for medical attention, Orth "used the blood from his forehead to write 'HELP' on the hold cell wall in big letters." *Id.* ¶ 129.  In response, officers told Orth that "because he wrote on the wall, he was going to be put in four-point restraints instead." *Id.* ¶ 130.  Orth was then left in four-point restraints "for hours" and remained in some form of restraints until at least 10:00 p.m. *See id.* ¶¶ 133–34.  This left Orth with diagnosed nerve damage and numbness in his feet. *See id.* ¶ 138.

In the aftermath of this incident, Plaintiffs allege that officers wrote four false incident reports. *See id.* ¶¶ 139–40.  In these reports, officers claimed that Orth acted aggressively in his cell, attempted to hide contraband in his locker, threatened violence against responding officers, and intentionally re-opened the cut on his face so that he could write the word "pig" in blood. *See id.* ¶¶ 141–44.  A subsequent BOP investigation found that Orth "became 'disruptive' in his cell

and . . . jumped towards staff in an 'aggressive' manner," and that BOP staff utilized appropriate techniques in restraining Orth.  *See id.* ¶¶ 146–48.  These reports and findings resulted in Orth losing 27 days of good time.  *See id.* ¶ 145.

### 3.  Tremaine Weekly

On March 1, 2021, Weekly requested a temporary transfer to the SHU due to safety concerns in his current housing dorm.  *See id.* ¶¶ 151–52.  Upon hearing his request, officers informed Weekly that he "could not go to the SHU 'for free'" and "punched Weekly in the face until Weekly fell to the ground."  *Id.* ¶¶ 153–54.  Although Weekly tucked himself into a ball and did not resist, the officers "threatened to kill Weekly" and "repeatedly kicked, punched, and stomped on him, at times while kneeling on his back."  *Id.* ¶¶ 154–55.  The officers eventually placed Weekly in handcuffs and alerted other staff to an ongoing emergency.  *See id.* ¶ 158. Weekly was then placed in ambulatory restraints and taken to the SHU.  *See id.* ¶ 159.

At the SHU, officers forcefully strip-frisked Weekly and kept him in tight ambulatory restraints that caused bleeding from his wrists.  *See id.* ¶¶ 160–62.  Weekly was left in this position for roughly twelve hours, during which time he was unable to eat food due to the tightness of the restraints.  *See id.* ¶¶ 166–67.  When Weekly informed one officer of this issue, the officer told Weekly that he "did not deserve to eat and if he could not eat the food with his hands, to 'dump it out and eat it off the floor.'"  *Id.* ¶ 167.

As a result of this incident, Weekly was left with "severe pain" in his back and side area, a split lip, a swollen eye, and "marks all over his head."  *See id.* ¶¶ 163–64.  Although a nurse evaluated Weekly, he was never given any medication or treatment for his injuries, and his request for X-rays was ignored.  *See id.* ¶ 165.  After filing a grievance, officers repeatedly harassed Weekly and warned him to stop filing paperwork.  *See id.* ¶¶ 175–76.

In August 2022, in response to Weekly setting off a metal detector that "[e]veryone knew . . . [was] broken," officers stripped Weekly, took him to the ground, and punched him repeatedly, causing scrapes and bruises.  *See id.* ¶¶ 179–80, 183.  When Weekly tried to tell one officer that the metal detector was broken, the officer responded: "[Y]ou think I don't know what I'm doing? Let's see what your lawyers say about this."  *Id.* ¶ 179. Weekly was then transferred to the SHU "for several days[,]" purportedly for "refusing an order."  *See id.* ¶¶ 181–82.

On December 5, 2022, officers conducted a pat-down search of Weekly.  *See id.* ¶ 187. After this search concluded without incident, Weekly began to walk away, at which point officers accused him of "running off" and ordered him to the ground.  *See id.* ¶ 188.  After Weekly complied with this order, one of the officers, "with no justification, jumped on Weekly's back and [began] choking him."  *Id.*  Officers then transported Weekly to a lieutenant's office, where they "falsely accused him of having a knife," threw him to the ground, and began choking him again. *See id.* ¶ 189.  Officers then transported Weekly to the SHU and left him in tight ambulatory restraints for approximately six hours.  *See id.* ¶ 190.  In the aftermath of this incident, "officers wrote false incident reports charging Weekly with assault on staff and possession of a weapon." *Id.* ¶ 191.  While this latter charge was later expunged, the former was downgraded to a "disruptive conduct" charge, resulting in 27 days of lost good time.  *See id.* ¶¶ 192–94.

### B.  Procedural Background

Plaintiffs initiated the present action on May 6, 2023, *see* DE 1, and filed an Amended Complaint on August 14, 2023, seeking relief under the FTCA for the alleged abuses carried out by Big Sandy staff.  *See* DE 23.  Specifically, each plaintiff asserts claims of assault (Counts 1–3), battery (Counts 4–6), negligence (Counts 7–9), intentional infliction of emotional distress (Counts 10–12), and negligent infliction of emotional distress (Counts 13–15).  Oquendo further alleges

medical negligence (Count 16), while Oquendo and Weekly both allege negligent hiring &
retention (Count 17) and negligent supervision (Count 18) pertinent to Lt. Pearce's employment.

On November 4, 2024, the United States moved to dismiss seventeen of Plaintiffs' claims
(Counts 1–15, 17–18) for lack of subject matter jurisdiction. *See generally* DE 39. Alternatively,
the motion seeks dismissal of eleven counts (Counts 7–15, 17–18) for failure to state a claim upon
which relief can be granted. The motion also argues that Oquendo and Weekly failed to
administratively exhaust some of their claims. Plaintiffs responded to the motion in full, *see* DE
42, and the United States replied. *See* DE 43. The matter is fully briefed and ripe for review.

## II.  LEGAL STANDARDS

### A.  Rule 12(b)(1)

The United States asserts sovereign immunity for seventeen of Plaintiffs' claims. Because
"[s]overeign immunity is jurisdictional in nature," a motion to dismiss on sovereign immunity
grounds is considered a motion to dismiss for lack of subject matter jurisdiction under Rule
12(b)(1). *See F.D.I.C. v. Meyer*, 114 S. Ct. 996, 1000 (1994).

A motion alleging lack of subject matter jurisdiction can challenge either "the sufficiency
of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual
attack)." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014) (citing *United States v. Ritchie*,
15 F.3d 592, 598 (6th Cir. 1994)). "The burden is on the plaintiff to prove that jurisdiction exists."
*RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1994). A facial
attack "goes to the question of whether the plaintiff has alleged a basis for subject matter
jurisdiction." *Id.* (quoting *Cartwright*, 751 F.3d at 759). A facial attack "challenges subject matter
jurisdiction without disputing the facts alleged in the complaint and requires the court to treat the
allegations of the complaint as true." *Bannister v. Pearce*, No. 7:22-cv-91-DLB, 2025 WL

394949, at *2 (E.D. Ky. Feb. 4, 2025) (emphasis omitted) (alteration in original) (quoting *L.C. v. United States*, 83 F.4th 534, 542 (6th Cir. 2023)); *see Am. Reliable Ins. Co. v. United States*, 106 F.4th 498, 504 (6th Cir. 2024) ("In a facial challenge, the material allegations in the pleadings are accepted as true and must be construed in the light most favorable to the nonmoving party." (citations omitted)).  Conversely, a factual attack "challenges the factual existence of subject matter jurisdiction;" it "attacks the factual allegations underlying the assertion of jurisdiction, even through the filing of an answer or otherwise presenting competing facts." *Bannister*, 2025 WL 394949, at *2 (quoting *L.C.*, 83 F.4th at 542).  In the case of a factual attack, "the court is free to weigh the evidence and satisfy itself of the existence of its power to hear the case." *Ritchie*, 15 F.3d at 598.

The United States may put forth either type of attack—factual or facial—when asserting sovereign immunity.  *See L.C.*, 83 F.4th at 542 ("The district court incorrectly concluded that any assertion of sovereign immunity amounts to a factual attack on jurisdiction. Motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) [may] either *facially* or *factually* attack jurisdiction." (citations omitted)).  Here, the United States frames its challenge to subject matter jurisdiction exclusively as a facial attack, *see* DE 39 at 3, a characterization that Plaintiffs do not dispute.  *See* DE 42 at 6.  Accordingly, the Court will analyze the Government's motion only under the facial-attack framework.

### B.  Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, "a formulaic recitation of a cause of action's elements will not do." *Twombly*, 127 S. Ct. at 1964–65. Courts "must construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). Yet, courts need not accept "legal conclusion[s] couched as [] factual allegation[s]." *Papasan v. Allain*, 106 S. Ct. 2932, 2944 (1986). Hinging on Rule 8's minimal standards, *Twombly* and *Iqbal* require a plaintiff to "plead facts sufficient to show that her claim has substantive plausibility." *Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014). Where a plaintiff states "simply, concisely, and directly events that . . . entitle[] [her] to damages," the rules require "no more to stave off threshold dismissal for want of an adequate statement." *Id.*; *see El-Hallani v. Huntington Nat'l Bank*, 623 F. App'x 730, 739 (6th Cir. 2015) ("Although *Twombly* and *Iqbal* have raised the bar for pleading, it is still low.")

## III. ANALYSIS

### A. Assault & Battery (Counts 1–6)

The Amended Complaint alleges that Big Sandy officers committed assaults (Counts 1–3) and batteries (Counts 4–6) against each of the three plaintiffs. These claims center around officers' alleged uses of force in response to (i) Oquendo's medical seizures on November 6, 2020 and January 15, 2021 (DE 23 ¶¶ 234–35, 252–53); (ii) Orth's "fishing" conduct on December 11, 2020 (*id.* ¶¶ 241, 259–60); and (iii) Weekly's request for a SHU transfer on March 1, 2021 (*id.* ¶¶ 246–47, 266).[2] The United States argues that these claims are barred by the FTCA because officers did

---

[2] Weekly also alleges assault and battery in connection with the December 5, 2022 pat-down search and subsequent use of force. *See id.* ¶ 267. However, because Weekly has not administratively exhausted his claims related to this incident, *see infra* Section III.F.2, the Court does not consider this conduct in its analysis here.

not carry out the alleged assaults and batteries while acting within the scope of their BOP employment.  Again, the attack is facial, testing only the allegations.

The United States is ordinarily entitled to sovereign immunity from suit.  *See Brownback v. King*, 141 S. Ct. 740, 745 (2021).  The FTCA provides a limited waiver of this immunity, as pertinent here, for negligent and intentional torts[3] carried out by federal law enforcement officers acting within the scope of their employment.  *See* 28 U.S.C. § 1346(b)(1); *see also United States v. Orleans,* 96 S. Ct. 1971, 1975 (1975); *Fitch v. United States,* 513 F.2d 1013, 1015 (6th Cir. 1975).  The FTCA is the exclusive remedy for tort actions against the federal government, its agencies, and its employees, as to conduct within the scope of employment.  *See* 28 U.S.C. § 2679(b)(1).  A waiver of the United States's sovereign immunity, such as the limited waiver provided by the FTCA, is "strictly construed, in terms of its scope, in favor of the sovereign."  *Lane v. Pena*, 116 S. Ct. 2092, 2096 (1996); *see Stocker v. United States*, 705 F.3d 225, 230 (6th Cir. 2013).

The United States contends here that, even accepting DE 23's factual allegations as true, Plaintiffs fail to establish (really, to sufficiently plead) that Big Sandy officers carried out the alleged assaults and batteries while acting within the scope of their employment.  "Whether an employee was acting within the scope of his employment is a question of law, not fact, made in

---

[3] Under the FTCA, the United States normally is immune from intentional torts such as assault or battery. *See* 28 U.S.C. § 2680(h). However, § 1346(b)(1)'s waiver of immunity still applies to certain enumerated intentional torts committed by "investigative or law enforcement officers." This means that if a plaintiff raises an assault or battery claim against a law enforcement officer, he may still recover against the United States upon a showing that the officer was "acting within the scope of his . . . employment." *See* § 1346(b)(1); *Millbrook v. United States*, 133 S. Ct. 1441, 1446 (2013) ("We hold that the waiver effected by the law enforcement proviso extends to acts or omissions of law enforcement officers that arise within the scope of their employment[.]"). For purposes of this analysis, the Court assumes that all referenced BOP officers were federal law enforcement officers and therefore subject to intra-scope, enumerated intentional tort claims. *See Chapa v. U.S. Dep't of Just.*, 339 F.3d 388, 390 (5th Cir. 2003) ("Thus, as defined in § 2680(h), a BOP official is a federal law enforcement officer.").

accordance with the law of the state where the conduct occurred." *Landham v. Taylor*, 68 F. App'x 608, 610 (6th Cir. 2003).[4]    Under Kentucky law,[5] "[a]n employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control." *Papa John's Int'l, Inc. v. McCoy*, 244 S.W.3d 44, 51–52 (Ky. 2008) (citation omitted).    In cases of intentional torts, the "focus is consistently on the purpose or motive of the employee in determining whether he or she was acting within the scope of employment." *Id.* at 51 (citing *Patterson v. Blair*, 172 S.W.3d 361, 369 (Ky. 2005)); *see Rudd v. United States*, No. 5:22-cv-201-GFVT, 2023 WL 4936671, at *2 (E.D. Ky. Aug. 2, 2023) ("The Commonwealth determines the scope of one's employment solely based on the employee's subjective motivation for acting." (citing *Patterson*, 172 S.W.3d at 369)).    Thus, "[t]orts committed to further the employer's business purpose in whole or in part, 'however misguided,' are torts committed within the scope of employment." *Laible v. Lanter*, 91 F.4th 438, 445 (6th Cir. 2024) (quoting *Papa John's*, 244 S.W.3d at 52).    Conversely, "[a]n employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer." *Papa John's*, 244 S.W.3d at 51–52 (quoting Restatement (Third) of Agency § 7.07(2)).

Applying this framework to the present case, the Government first argues that officers could not have been acting within the scope of their BOP employment because "[t]he duties of an employee include those that he or she is 'expressly or impliedly' hired to perform, and federal correction officers are not hired to beat and abuse inmates."  DE 39 at 6 (citation omitted); *see id.*

---

[4] In analyzing scope of employment as a question of law, the Court must still, in the context of a facial attack, judge the adequacy of Plaintiffs' allegations on the particular legal point. *See, e.g.*, *Boswell v. United States*, No. 7:23-cv-66-KKC, 2025 WL 967161, at *5 (E.D. Ky. Mar. 31, 2025) (analyzing, in context of facial scope-of-employment challenge, the sufficiency of plaintiff's pleaded allegations).
[5] All relevant alleged conduct occurred at USP Big Sandy in Inez, Kentucky.

at 7 (noting that "the BOP's regulations specifically prohibit correction officers from using force to punish inmates").  The Government further summarizes its position as follows:

> Plaintiffs repeatedly emphasize in the Amended Complaint that BOP . . . correction officers involved 'believed' they were acting in the scope of their employment, but the employee's subjective belief is not a factor for consideration under Kentucky's scope of employment jurisprudence. The bottom line is that the alleged conduct is not similar to the conduct the correction officers were hired to perform[.]

*Id.* at 8 n.5 (internal citation omitted).

Not only is this position incorrect, but the "subjective belief" standard dismissively chided by the Government is in fact the correct and primary analysis here.  The mere fact that officers may have acted contrary to BOP policies is not itself determinative in the scope-of-employment evaluation; instead, the critical question in the case of an intentional tort is whether the employee's conduct was motivated, at least in part, by a *subjective intent* to further the employer's business interests.  *See Laible*, 91 F.4th at 445 (citing *Papa John's*, 244 S.W.3d at 51–52).  As a result, an "employer's decision to forbid an activity does not decide the issue if the employee nevertheless believes that he is acting in his employer's interest."  *Rudd*, 2023 WL 4936671, at *5 (citation omitted).  The analysis put forward in *Fredrick v. Collins*, 378 S.W.2d 618 (Ky. 1964) offers a clear illustration of this principle.  There, a store clerk shot an individual attempting to rob the store, despite the store manager's earlier instruction to "never [] resist a holdup."  *See id.* at 618.  Although the store clerk clearly violated the rules for an assigned job duty by shooting the robber, he nevertheless acted within the scope of his employment because his subjective intent was to satisfy what he perceived as his "obligation generally to manage and protect the [employer]'s store and its contents."  *See id.* at 619–20.  Thus, the central consideration is not whether BOP regulations prohibited officers' alleged conduct, but whether officers acted with a subjective intent, to any degree, to further BOP interests.

13

The United States also argues that officers could not have acted within the scope of their employment because DE 23 characterizes the alleged beatings as "unprovoked, unjustified attacks," while failing to "illuminate[] how [these self-described] unprovoked, unjustified attacks . . . would benefit the BOP" or otherwise be perceived as "expectable in view of a correction officer's duties."  DE 39 at 7; *see* DE 43 at 3–4 ("Plaintiffs fail to explain how the unjustified physical abuse they allege would in any way benefit the Bureau of Prisons as a whole. . . . [T]o prove jurisdiction, Plaintiffs would have to undermine the substance of their own claims. If BOP employees beat Plaintiffs for no reason as they allege, Plaintiffs are not entitled to relief against the United States under the FTCA.").  In response, Plaintiffs contend that although they "allege that [officers'] conduct amounted to assault and battery that was not justified, they also allege that internal BOP paperwork [(including relevant incident reports)] . . . demonstrate[s] that the BOP staff's intent was to serve the goals of the BOP and was at least incidental to conduct that is authorized by the BOP." DE 42 at 11.[6]  The Government counters that Plaintiffs' reliance on these incident reports is misplaced because the reports "do not demonstrate that BOP staff abused [Plaintiffs] to further the BOP's interests; rather, they simply assert that [Plaintiffs'] allegations are completely unfounded."  DE 43 at 3.  In this sense, the Government argues that Plaintiffs are left in a Catch-22:

---

[6] Plaintiffs also argue that a scope-of-employment finding at this stage of litigation would be premature given that "BOP staff's accounts of what happened with Plaintiffs" conflict with the conduct alleged in the Amended Complaint, thereby necessitating a "fact-intensive inquiry" to determine officers' true subjective intent. *See id.* at 9–10. In support of this position, Plaintiffs cite two recent opinions from this District in which the court declined to rule on whether BOP officers acted within the scope of their employment pending "a more developed record[.]" *See id.* at 9 (discussing *Foster v. United States*, No. 6:23-cv-179-CHB, 2024 WL 3445482 (E.D. Ky. July 17, 2024) and *Taylor v. United States*, No. 7:22-cv-97-CHB, 2024 WL 4346372 (E.D. Ky. Sep. 30, 2024)). However, these rulings were both expressly made in the context of a factual attack on jurisdiction. *See Foster*, 2024 WL 3445482, at *3; *Taylor*, 2024 WL 4346372, at *9. Plaintiffs here agree that the Government brings a facial challenge. *See* DE 42 at 6. Thus, the persuasive authority of *Foster* and *Taylor* is limited in this context: At this stage, the Court must merely address whether Plaintiffs, based solely on the face of the Amended Complaint, have adequately alleged that officers acted within the scope of their employment.

Plaintiffs have alleged that the force used against them was entirely unprovoked. Accepting that allegation as true, the officers were obviously acting outside the scope of their employment. Plaintiffs cannot have it both ways. If the Court were to accept the officers' version of events as true (*i.e.* that no force was used or that the force used was justified), the officers did not commit assault or battery, and Counts 1 through 3 for assault and Counts 4 through 6 for battery should all still be dismissed for failure to state a claim upon which relief can be granted.

DE 39 at 9.

The Government once again confuses subjective intent with objective reasonableness. "The lodestar for deciding the scope of employment inquiry is 'the *servant's* purpose for the intentional act that was perpetrated.'" *Boswell v. United States*, No. 7:23-cv-66-KKC, 2025 WL 967161, at *6 (E.D. Ky. Mar. 31, 2025) (quoting *Rudd*, 2023 WL 4936671, at *5). "In contrast, asking whether the employee's conduct was 'provoked,' 'justified,' or 'warranted' focuses not on the subjective motive of the employee but on the objective reasonableness of the conduct of persons *other than* the employee, and is therefore misplaced." *Id.* Thus, whether Plaintiffs (or any other third party) perceived officers' conduct as being "unprovoked" or "unjustified" is a wholly separate consideration from whether officers acted with a *subjective intent* to advance job-related goals. *See id.* ("[R]egardless of whether the employee's actions are wholly misguided, or even amount to a [seemingly unprovoked or unjustified] civil tort or criminal offense, they are done within the scope of employment if motivated by a subjective desire to further the employer's business." (quoting *Laible*, 91 F.4th at 445)); *Papa John's*, 244 S.W.3d at 51 (emphasizing scope-of-employment analysis centers around "the purpose or motive *of the employee*").

Here, the United States expressly frames its motion as a facial attack on subject matter jurisdiction. Accordingly, because the Court must accept as true all of DE 23's non-conclusory factual allegations, the bar for establishing officers' subjective intent is correspondingly restrained. In *Boswell*, for example, Judge Caldwell confronted a similar battery claim against BOP officers

and found that, in the context of a facial challenge, plaintiff adequately alleged that officers acted within the scope of their employment:

> Boswell's complaint [] includes further allegations which indicate that the named defendants were performing their duties as correctional officers during the [alleged battery]. *See* R. 1 at 10, ¶¶ 33–37 (generally describing the defendants' job titles and positions); R. 1 at 11, ¶¶ 45–48 (indicating that the defendants were present in the Lieutenant's Office when Boswell requested protective custody, asked about the nature of his criminal convictions when assessing that request, and personally participated in the assault); R. 1 at 13, ¶¶ 60–64 (indicating that the defendants were present when he was escorted to the segregation unit, permitted the other inmate to attack him and declined to stop it, implied that they had given the other inmate permission ("the green light") to attack Boswell, and issued a false incident report against him). These allegations indicate that the defendants' conduct occurred: (a) at their place of business; (b) during their normal working hours; and (c) in the course of their duties when considering Boswell's request for protective custody and while placing him in a cell. Taking those allegations as true, they are more than sufficient to conclude that the defendants were acting within the scope of their employment when they directly participated in the attack upon Boswell or facilitated another inmate's attack. **As this Court has recently noted, asserting a facial attack when presented with such allegations is an exercise in futility because the government's assertion that the defendants were not acting within the scope of their employment will *necessarily* fail.**

*Boswell*, 2025 WL 967161, at *5 (footnote omitted) (bolded emphasis added).

As alluded to by *Boswell*, *Rudd* found similarly when confronted with a facial scope-of-employment attack:

> If the United States were correct and it brought a facial attack, its motion would be self-defeating. If the Court conducted a facial inquiry, it would be obligated to assume that the allegations in Ms. Rudd's complaint are true. Ms. Rudd alleges that a conspiracy exists among the management of the United States Prisons to permit guards to assault and sexually abuse inmates as a means of controlling prisoner behavior. Were that to be true, Mr. Salcido might have believed he was furthering his employer's interests and could have acted within the scope of his employment. For obvious reasons, the Court doubts that the Government intended to fall on its own sword in this manner.

*Rudd*, 2023 WL 4936671, at *3 (citations omitted).

Applying *Boswell* and *Rudd*, DE 23 undoubtedly alleges that the officers carried out the assaults and batteries (1) at their place of business and (2) during normal working hours. Further,

for all three plaintiffs, officers were, by any reading, initially acting "in the course of their duties" while (i) responding to calls for medical assistance during Oquendo's seizures (DE 23 ¶¶ 31–32, 37–38); (ii) observing and responding to Orth's prohibited "fishing" conduct (¶ 118); and (iii) considering and reacting to Weekly's request for protective placement in the SHU (¶¶ 151–52). Like in *Boswell*, these allegations, accepted as true, facially establish, as to place and function, that officers "were acting within the scope of their employment when they directly participated in the attack[s] upon" each of the three plaintiffs. And again, the officers' motivation, a subjective prism, controls.

Contrary to the Government's position, Plaintiffs' references to relevant incident reports do not alter this conclusion. It is not inherently contradictory for Plaintiffs to dispute the objective truthfulness of these reports while also using them as evidence of officers' subjective intent. In the case of Oquendo, the incident reports claim he was acting "combative," "uncooperative," and with an "altered level of consciousness." *See* DE 23 ¶¶ 110–11. This supports the inference that officers were acting, at least in part and at points, with the intent to subdue an out-of-control inmate, a purpose that certainly furthers a legitimate BOP interest. Officers also did not begin beating and restraining Oquendo completely unprompted—they were responding to an emergency situation in which an inmate was, in their telling, acting uncooperative and combative. Responding to such a situation, and subduing such an inmate, undoubtedly falls within the scope of an officer's employment. This would remain true even if officers intentionally used more force than was objectively necessary to subdue Oquendo or falsified certain aspects of their incident reports—as long as their actions were motivated, to at least *some partial degree*, by a desire to further employer interests, said actions remain within the scope of employment.

Similar principles apply to Orth and Weekly. Officers observed Orth passing items between cells, a prohibited activity. Responding to and addressing prohibited inmate behavior is certainly within an officer's scope of employment. Additionally, officers' incident reports claim Orth was "disruptive and threatening." *See* DE 23 ¶ 139. While Plaintiffs claim this characterization of Orth's conduct is false, in the context of a facial attack, it nonetheless supports that officers subjectively believed they were acting with the purpose of subduing an unruly inmate. And even if one accepts that officers are outright lying about Orth's behavior, such lies may still have been made in furtherance of what officers saw, perhaps in a warped way, as the BOP's interest in properly punishing a misbehaving inmate.

Finally, as to Weekly, officers were addressing his request for a transfer to the SHU. Responding to such a request is certainly within the scope of a BOP officer's employment. *See Boswell*, 2025 WL 967161, at *5 ("[Officers acted] in the course of their duties when considering Boswell's request for protective custody and while placing him in a cell."). The incident reports claim Weekly was acting "disruptive" and "non-compliant." DE 23 ¶ 168. Thus, like Oquendo and Orth, one may infer that officers' actions were motivated by a misguided desire to appropriately deal with a disorderly inmate's transfer request. On a disputed record where the pleadings alone tell the tale, the Court must credit Plaintiffs' allegations in the analysis.

The cases relied upon by the Government do not change the Court's conclusion. For example, the United States cites to *Greene v. United States*, No. 6:22-cv-120-WOB, 2023 WL 309320 (E.D. Ky. Jan. 18, 2023). There, the court found that prison staff acted outside the scope of their employment. But *Greene*, like many of the Government's referenced cases, involved sexual assault, and courts have been careful to distinguish sexual assault from other intentional torts under the FTCA. *See id.* at *3. Additionally, the plaintiff in *Greene* specifically alleged that

officers acted with the *sole intent* of intimidating and/or retaliating against him for filing a previous complaint.  Plaintiffs here do not allege this type of purely personal, non-BOP motive for acting.

Similar reasoning can be used to distinguish *Robinson v. United States*, No. 6:21-cv-204-REW, 2024 WL 1219716 (E.D. Ky. Mar. 21, 2024).  There, the court found that BOP officers did not carry out an alleged assault while acting within the scope of their employment.  However, the plaintiff in *Robinson* alleged that officers assaulted him for *purely* personal and retaliatory reasons, unrelated to any tangential job purpose.  *See id.* at *10.  This is in contrast to the alleged assaults here, which were all, as alleged, at least partially driven by some job-related purpose (*e.g.*, responding to an inmate's medical emergency, observing an inmate engage in prohibited conduct, or addressing an inmate's transfer request).  And even if officers' subsequent actions were objectively unreasonable or even criminal, Plaintiffs make no allegation that they "acted [purely] for personal or vindictive reasons."  *Boswell*, 2025 WL 967161, at *7.  Indeed, the Amended Complaint repeatedly makes specific scope allegations, and given the other factual content, these, in the Court's view, are not merely offered as legal conclusions.  *See, e.g.*, DE 23 ¶¶ 11, 28, 116–17, 146, 149, 170, 195.

 In sum, the Government's decision to present its motion as a facial challenge dooms its scope-of-employment argument from the start.  Plaintiffs have alleged facts that, accepted as true, adequately establish that officers acted, at least in part, with the subjective intent of furthering their employer's interests.  Accordingly, the Court denies the Government's motion to dismiss Counts 1–6.

### B.  Negligent Hiring, Retention, and Supervision (Counts 17–18)

The United States next seeks dismissal of Counts 17 and 18, which allege that the BOP negligently hired, retained, and supervised Big Sandy staff.  The United States argues that these

claims are barred by the FTCA's "discretionary function exception," which shields the Government from liability for

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

The discretionary function exception "is broad in scope and places a 'significant limitation on' the FTCA waiver." *Snyder v. United States*, 590 F. App'x 505, 509 (6th Cir. 2014) (quoting *Montez ex rel. Estate of Hearlson v. United States*, 359 F.3d 392, 395 (6th Cir. 2004)). To determine whether the exception applies, courts engage in a two-part inquiry. "First, the challenged government action must have been discretionary; it must 'involv[e] an element of judgment or choice.'" *L.C.*, 83 F.4th at 543 (alteration in original) (quoting *United States v. Gaubert*, 111 S. Ct. 1267, 1273 (1991)). An action is discretionary unless "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee had no rightful option but to adhere to the directive." *Id.* (quoting *Milligan v. United States*, 670 F.3d 686, 693 (6th Cir. 2012)); *see Gaubert*, 111 S. Ct. at 1277 (stating that government actions are not discretionary when "they [are] . . . controlled by mandatory statutes or regulations").

If the action is deemed discretionary, the Court then asks at Step 2 whether the action "is of the kind that the discretionary function exception was designed to shield." *L.C.*, 83 F.4th at 543 (quoting *Gaubert*, 111 S. Ct. at 1273). This requires that the action be susceptible to analysis as a matter of social, economic, or political policy. *See Gaubert*, 111 S. Ct. at 1273–74. In this sense, a plaintiff's claim must not effectively require the Court to second-guess "the political, social, and

economic judgments of an agency exercising its regulatory function." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 104 S. Ct. 2755, 2768 (1984). Thus, to avoid dismissal under the exception, a plaintiff "must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Montez*, 359 F.3d at 397.

"This Circuit has consistently held that agency supervisory and hiring decisions fall within the discretionary function exception." *Snyder*, 590 F. App'x at 510; *see O'Bryan v. Holy See*, 556 F.3d 361, 384 (6th Cir. 2009) ("[T]he selection of employees, officials and officers typically falls within the scope of the FTCA's discretionary function exception."). Accordingly, a claim for negligent hiring, retention, and/or supervision is barred at Step 1 if said claim fails to point to "specific regulations that would constrain the judgment exercised in making [employment] decisions." *Snyder*, 590 F. App'x at 510. Courts have consistently applied this principle to a wide range of agencies, including the BOP. *See, e.g.*, *id.* ("Because FBI hiring, supervision, training, and retention require policy judgments—the type that Congress intended to shield from tort liability—and because Plaintiff failed to allege the United States' nonconformance with any applicable regulations, we find that the district court lacked subject matter jurisdiction." (alterations cleaned up) (internal citation omitted)); *Tebault v. United States*, 778 F. Supp. 3d 912, 919 (W.D. Ky. 2025) ("[Plaintiff] has not alleged that the government's training, supervision, or retention of [Veterans Affairs employee] 'violated a mandatory regulation or policy that allowed no judgment or choice.' Because [Plaintiff] 'failed to allege the United States' nonconformance with any applicable regulations,' the first prong of the test is not met. And given that the Sixth Circuit has held that supervision, training, and retention decisions involve discretion intended to be protected by the FTCA, the Court lacks subject-matter jurisdiction over these claims." (citations

omitted)); *Norman v. United States*, No. 5:25-cv-56-DCR, 2025 WL 2211462, at *4 (E.D. Ky. Aug. 4, 2025) (applying the exception to BOP hiring, supervision, and retention decisions).

Here, Plaintiffs contend that the discretionary function exception does not apply at Step 1 because "the BOP has specific [mandatory] policies concerning the use of force, the use of restraints, and the documentation required following a use of force incident."  DE 42 at 18–19 (citing relevant BOP policies).  This argument is misplaced.  Whether officers acted with discretion pursuant to use-of-force or use-of-restraints policies is irrelevant to determining whether the BOP acted with discretion in the hiring, retention, and/or supervision of BOP officers.  Plaintiffs make no attempt to address this latter scenario, nor do they address *Snyder* and its lineage of cases applying the discretionary function exception to an agency's employment decisions.  Accordingly, the Court will dismiss Counts 17 and 18 as barred by the discretionary function exception.[7]

### C.  Negligence (Counts 7–9)

The United States argues that Plaintiffs' general negligence claims (Counts 7–9) are likewise barred by the discretionary function exception.  These negligence claims allege the BOP breached its duty "to provide custodial care and supervision" to Plaintiffs because staff  "knew or should have known" of officers' alleged misconduct, yet still "fail[ed] to take reasonable steps to prevent [each plaintiff] from being assaulted, battered, harassed, mistreated, and targeted by BOP staff at Big Sandy."  *See* DE 23 ¶¶ 271–312.

In support of dismissal, the Government relies primarily on *Montez ex rel. Estate of Hearlson v. United States*, 359 F.3d 392 (6th Cir. 2004).  There, the estate of a murdered federal inmate alleged that prison staff negligently failed to protect the inmate from harm.  In support, plaintiff pointed to BOP regulations that required employees to "provide for the safekeeping . . .

---

[7] Because the Court lacks subject matter jurisdiction over Counts 17 and 18, it does not address the merits of the Government's Rule 12(b)(6) argument for these claims.

[and] protection" of prisoners." *Id.* at 396. The Sixth Circuit, however, found that the discretionary function exception applied because such general policies did "not mandate any specific course of action on the part of BOP officials," and instead required staff "to exercise judgment when making decisions regarding [inmate] safety." *Id.* at 396–97. The court further posited that "[a]s a general principle, a complaint that alleges the existence of a specific and immediate threat against an inmate is more likely to survive a motion to dismiss than a complaint that either alleges a nonspecific threat or provides only conclusory statements regarding the existence of a threat." *Id.* at 398.

Applying *Montez* here, the United States argues that "Plaintiffs have not alleged any facts tending to show a 'specific and immediate threat' where another prison official could have intervened and prevented the complained-of conduct." DE 39 at 18. However, as Plaintiffs point out in response, the Government's reliance on *Montez* is largely unpersuasive in light of the Sixth Circuit's recent decision in *L.C. v. United States*, 83 F.4th 534 (6th Cir. 2023). There, the court rejected the notion that *Montez* stands for the proposition "that an incarcerated individual must plead the existence of a specific and immediate threat to demonstrate that failing to keep an inmate safe was not based in policy considerations." *Id.* at 548–49. The court further clarified that even "[a]side from this incorrect reading, *Montez*'s holding . . . cannot be universally applied to every case involving harm to incarcerated individuals" because it applies only in the narrow context of "a claim that the BOP failed to protect adequately an incarcerated [plaintiff] from attacks *by other incarcerated people*." *Id.* at 549 (emphasis added). Thus, the court found that an inmate's negligence claim premised on staff's failure to report and investigate an officer's sexual assault fell outside the discretionary function exception "[b]ecause BOP policy requires that its staff timely report and investigate any information pertaining to sexual assault or harassment by a BOP

official, and, in any event, the decision to report and investigate is not susceptible to policy analysis." *Id.*

Here, BOP policies put forth mandatory rules concerning the proper use of force and proper use of restraints, as well as mandatory rules for properly documenting and reporting these applications. *See* DE 42 at 18–19 (citing relevant CFR regulations). The Amended Complaint alleges that each time a plaintiff was "assaulted, battered, harassed, mistreated, [and/or] targeted by BOP staff," there were additional "BOP staff present to observe the conduct directed at [each plaintiff], and the specific and immediate risk that it imposed." DE 23 ¶¶ 282, 295, 308. Accepting these allegations as true, staff had a mandatory duty to ensure that applicable use-of-force and use-of-restraint policies were properly followed, as well as a duty to accurately report their observations of incidents implicating these policies. As a result, Plaintiffs' general negligence claims, at least at this stage, fall outside of the discretionary function exception and persist.

### D.  IIED (Counts 10–12)

Counts 10–12 assert intentional infliction of emotional distress (IIED) claims on behalf of each inmate. These claims allege that "BOP staff engaged in intentional and reckless conduct" by: "assaulting, restraining, harassing, and repeatedly threatening Oquendo" (DE 23 ¶ 314); "assaulting, battering, and unjustifiably restraining Orth" (¶ 319); and "assaulting, battering, restraining, harassing, threatening, and repeatedly targeting Weekly" (¶ 324). Each count further details the ways in which officers caused Plaintiffs to suffer "severe emotional distress." *See id.* ¶ 315 (alleging Oquendo suffered severe emotional harm by virtue of officers "putting [him] in fear for his life on multiple occasions, beating him, refusing him access to water, showers, and the restroom for days on end, forcing him to defecate on himself, threatening to kill him, encouraging other inmates to cause him physical harm, and subjecting him to false incident reports and punitive

measures"); ¶ 320 (alleging Orth suffered same harm due to officers "putting him in fear for his life, unjustifiably restraining him in four-point restraints, failing to provide him with necessary medical attention resulting in permanent physical injuries, and falsely filing incident reports against him"), ¶ 325 (alleging Weekly suffered same harm due to officers "putting him in fear for his life, threatening him, harassing him, and falsely accusing him of serious offenses").  The United States moves for dismissal of these claims under both Rule 12(b)(1) and Rule 12(b)(6).

### 1.  Rule 12(b)(1)

The Government first argues that, to the extent Plaintiffs' IIED claims arise from the same conduct as their assault and battery claims, they too fall outside the scope of officers' employment. This argument fails for the reasons articulated *supra* Section III.A.

Next, the United States asserts that those IIED claims "related to falsifying incident reports, placement in SHU, perceived threats by correction officers, and jokes by correction officers at the expense of Plaintiffs" are barred by 28 U.S.C. § 1346(b)(2), which prohibits incarcerated felons from bringing an FTCA claim "for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act."  *See* DE 39 at 11.  Plaintiffs respond that all of their IIED claims "clearly involve [prior] physical injury" by virtue of the incidents in which BOP staff assaulted, battered, improperly restrained, and/or denied medical attention to each plaintiff.  *See* DE 42 at 14–15.  The United States does not further address this issue or Plaintiffs' argument in reply.

Construing DE 23 favorably to Plaintiffs, the Court finds that Plaintiffs have sufficiently alleged a prior showing of physical harm.  Plaintiffs contend that the conduct alleged in their IIED claims, as well as the emotional harm suffered from said conduct, directly stems from or pairs with the physical harm inflicted by officers in the alleged assaults, batteries, and improper uses of

25

restraints.  Especially in light of the Government's lack of reply, this argument is adequate at the pleading stage to satisfy § 1346(b)(2)'s physical injury requirement.  *See Susinka v. Trujillo*, No. 21-cv-1837, 2022 WL 17770641, at *6 (D. Colo. Dec. 19, 2022), *report and recommendation adopted*, 2023 WL 2366730 (D. Colo. Mar. 6, 2023) ("[Plaintiff's IIED claim] does not allege any prior physical injury connected to his cellmate assignment, BOP staff ignoring his hunger strike, cell conditions, filing of false reports, or intimidation by BOP staff. . . . Construing Plaintiff's claim liberally, however, the Court finds that Plaintiff does allege a prior physical injury connected to [these incidents].  Plaintiff's injuries from [an earlier battery] are central to his Amended Complaint, and those physical injuries are connected to [the emotional harms alleged in Plaintiff's IIED claims].").  The Court therefore denies the Government's motion to dismiss Counts 10–12 for lack of subject matter jurisdiction.

### 2.  Rule 12(b)(6)

*Gap-Filler Status.*  Under Kentucky law, a claim for IIED (also known as the tort of outrage), standing alone, must allege (1) "that defendant's conduct was intentional or reckless," (2) "that the conduct was so outrageous and intolerable as to offend generally accepted standards of morality and decency," (3) "that a causal connection exists between the conduct complained of and the distress suffered," and (4) "that the resulting emotional stress was severe."  *Banks v. Fritsch*, 39 S.W.3d 474, 480–81 (Ky. Ct. App. 2001) (citing *Humana of Ky., Inc. v. Seitz*, 796 S.W.2d 1, 2–3 (Ky. 1990)).  However, Kentucky courts construe IIED as a mere "gap-filler" that provides an independent cause of action only "where traditional common law actions do not."  *Id.* at 481.  Thus, an IIED claim is generally unavailable if a defendant's conduct "amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed."  *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky.

Ct. App. 1993); *see Childers v. Geile*, 367 S.W.3d 576, 581 (Ky. 2012) (holding that "a plaintiff cannot maintain *both* a [traditional tort] claim and an [IIED] claim based on a single set of facts"). If alleged conduct can be properly addressed by one of these traditional torts, a plaintiff may maintain a separate IIED claim only if the tortfeasor "*solely* intended to cause [plaintiff] extreme emotional distress." *Estep v. Combs*, 366 F. Supp. 3d 863, 887 (E.D. Ky. 2018) (emphasis added) (quoting *Green v. Floyd Cnty.*, 803 F. Supp. 2d 652, 655 (E.D. Ky. 2011)).

The Government argues here that, to the extent DE 23's IIED claims rely on officers' uses of force against Plaintiffs, "those allegations are more properly categorized as assault and battery," and Plaintiffs do not otherwise allege any instance in which BOP staff acted with the sole intent of causing Plaintiffs extreme emotional distress. DE 39 at 12. Plaintiffs in response concede that "while it may be true that there is some overlap between the conduct giving rise to Plaintiffs' claims for assault and battery and Plaintiffs' claims for IIED, there is clearly not full overlap in the allegations supporting those claims." DE 42 at 15–16.

Contrary to Plaintiffs' position, there is no requirement, for preclusion, that the conduct alleged in an IIED claim "fully overlap" with the conduct alleged in another claim. Instead, Kentucky courts simply ask whether "an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery of emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim." *Banks*, 39 S.W.3d at 481; *see Childers*, 367 S.W.3d at 584 ("If a set of facts establishes a traditional tort, by definition it *cannot* establish intentional infliction of emotional distress.").

Plaintiffs, by their own words, explicitly premise their IIED claims in part on officers assaulting and/or battering each plaintiff. *See* DE 23 ¶¶ 314, 319, 324. And nowhere does DE 23 indicate that officers assaulted or battered Plaintiffs with the *sole intent* of causing Plaintiffs severe

27

emotional harm; indeed, this is impossible given that battery requires an intent to cause unwanted touching (*i.e.*, an intent to cause more than just emotional harm). *See Estep*, 366 F. Supp. 3d at 887. Moreover, Plaintiffs already allege (and seek damages for) "severe emotional harm" in each of their battery claims. *See id.* ¶¶ 257, 264, 270. "When an [IIED] claim is based on 'the *same* emotional distress' resulting from other alleged torts, Kentucky law prohibits recovery for the stand-alone [IIED] tort." *Estep*, 366 F. Supp. 3d at 887 (quoting *Childers*, 367 S.W.3d at 582). As a result, even construing DE 23 favorably, the Court can only read Plaintiffs' IIED claim, to the extent it relies on officers' assaults and batteries, "as an element of damages" arising out of those torts. *See id.* Accordingly, the portions of Plaintiffs' IIED claims relying on conduct already alleged in their assault and battery claims must fail.

      ***Extreme and Outrageous Conduct.*** The Government further argues that officers' alleged threats and jokes "do not rise to the level of extreme and outrageous conduct necessary for an IIED finding." *Id.* at 12.

> [To bring an IIED claim,] a party must establish that the wrongdoer intentionally or recklessly caused severe distress. The Kentucky Supreme Court has instructed that to establish recklessness, "the wrongdoer must engage in conduct which demonstrates total disregard for the other party . . . that is so insensitive and irresponsible as to rise to the level of being deemed virtually intentional." "It must be the conduct which any normal and prudent person would know was likely to cause extreme emotional distress." To prove the second element of extreme and outrageous conduct, a party must point to conduct that is "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" In addition, "extreme and outrageous behavior 'may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity.'" Finally, the Kentucky Supreme Court has stated that to prove the fourth element of severe emotional distress, "substantially more than mere sorrow is required."

*Nationwide Mut. Ins. Co. v. Ramey*, 230 F.3d 1359 (6th Cir. 2000) (citations omitted).

The Government contends that the high bar for showing "extreme and outrageous" conduct was not met when, *e.g.*, officers: joked about the overtime compensation they received for watching Oquendo (¶¶ 60–62, 69); welcomed Oquendo "back from the dead" and referred to him as a "dead man walking" after his hospitalization (¶¶ 46, 66, 68); questioned Oquendo about the letter he wrote to his family and counsel (¶ 77); joked about Oquendo and Weekly's "fancy New York lawyers" (¶¶ 76, 177); and singled out Weekly for filing grievances (¶¶ 174–76). *See* DE 39 at 12–13. Plaintiffs disagree, arguing that officers' comments were sufficiently outrageous when viewed in the context of the beatings and conditions that Plaintiffs were subjected to. *See* DE 42 at 16. Once again, the United States does not further address this issue in reply.

The officers' alleged comments do not plausibly satisfy the elements of an IIED claim. Prison staff's verbal threats and jokes, particularly in the context of the relationship between a prisoner and correctional officer, could not be construed as outrageous conduct that could have been expected to cause, was solely intended to cause, and did cause severe emotional distress. The alleged jokes/insults are not the sort of behavior a normal and prudent person would know was likely to cause extreme emotional distress. And Plaintiffs do not put forth any non-conclusory allegations showing how they actually suffered severe emotional harm, nor do they allege they were particularly susceptible to emotional distress in some way that was known to officers. The alleged facts, accepted as true, fail the outrageousness, intentionality, and causality elements. *See Taylor*, 2024 WL 3739664, at *7 (finding same where BOP officer used "derogatory terms" and made "aggressive and threatening" comments to inmate during and after alleged assault).

Finally, all three plaintiffs premise their IIED claims in part on officers filing false incident reports against them. *See* DE 23 ¶ 315 (alleging officers harmed Oquendo by "subjecting him to false incident reports and punitive measures including loss of good time"); ¶ 320 (harming Orth

by "falsely filing incident reports against him, causing him to lose good time credit and other privileges"); ¶ 325 (harming Weekly by "falsely accusing him of serious offenses, causing him to lose good time and other privileges"). As the Government notes, a claim predicated on the loss of good-time credit due to false disciplinary charges is properly brought as a *Bivens* civil rights action, not as an FTCA claim. *See Newsome v. United States*, No. 5:07-cv-397-KSF, 2008 WL 559685, at *5 (E.D. Ky. Feb. 28, 2008) ("Neither is the plaintiff permitted to challenge his [disciplinary] conviction through a civil action which he has incorrectly labeled as an FTCA, but which in reality is a *Bivens* civil rights action."). Accordingly, the Court will dismiss Plaintiffs' IIED claims to the extent they rely on GTC harm caused by officers' false incident reports. That does not mean the evidence, indeed all of the evidence marshalled in the IIED sphere, will not be relevant in assessing the persisting claims.

Based on the foregoing, the Court dismisses Plaintiffs' IIED claims in part, to the degree they are premised on (a) conduct already alleged as part of Plaintiffs' assault and battery claims, (b) officers' jokes and threats, and (c) officers' false disciplinary charges. These are the only grounds for dismissal offered by the Government under Rule 12(b)(6); accordingly, the rest of Plaintiffs' IIED claims may proceed forward.

### E. NIED (Counts 13–15)

The Government next moves for dismissal of Plaintiffs' negligent infliction of emotional distress (NIED) claims. Plaintiffs' NIED claims are largely identical to their ordinary negligence claims (Counts 7–9), with both alleging the same conduct, duty, breach, and damages. *See* DE 23 ¶¶ 328–42. Courts in this District bestow NIED claims with the same "gap-filler" status applied to IIED claims. *See Profitt v. Highlands Hosp. Corp.*, No. 7:19-cv-15-KKC, 2022 WL 1275632, at *9 (E.D. Ky. Apr. 28, 2022) ("[Plaintiffs' NIED claim] derives from the same events as [their]

broader negligence claim, for which the plaintiff may recover damages for emotional distress. . . . In the absence of guidance from Kentucky state courts, federal district courts in Kentucky have extended the [gap-filler status articulated in] *Childers* to NIED claims. . . . Accordingly, the Court [dismisses] . . . Plaintiffs' claim for negligent infliction of emotional distress."). Here, Plaintiffs' NIED claims derive from the same conduct alleged in their general negligence claims. Further, both sets of claims seek identical damages for "severe emotional harm." *Compare* DE 23 ¶¶ 286, 299, 312, *with* ¶¶ 332, 337, 342. "When an [IIED/NIED] claim is based on 'the *same* emotional distress' resulting from other alleged torts, Kentucky law prohibits recovery for the stand-alone emotional distress tort [and] . . . the [IIED/NIED] claim fails [at the pleading stage] as a matter of law." *Estep*, 366 F. Supp. 3d at 887–88. Accordingly, the Court will grant the Government's motion to dismiss Plaintiffs' NIED claims.

### F. Administrative Exhaustion

Finally, the United States argues that Oquendo and Weekly each failed to administratively exhaust portions of their claims. Under the FTCA, a plaintiff must "present" an administrative claim—typically via a Standard Form 95 (SF-95)—to the appropriate federal agency before an action for money damages can be instituted against the United States in district court. *See* 28 U.S.C. § 2675(a). "A claim submitted to the proper administrative agency is considered sufficient to satisfy the exhaustion requirement if it is a 'written notification of an incident, accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death.'" *Abbott v. United States*, 78 F.4th 887, 899 (6th Cir. 2023) (quoting *Blakely v. United States*, 276 F.3d 853, 864 (6th Cir. 2002)); *see also* 28 C.F.R. § 14.2(a) (requiring only "written notice of an incident, accompanied by a claim for money damages").

### 1. Oquendo

The United States argues that Oquendo's SF-95, presented to the BOP in June 2022, "fails to raise any of the allegations in the Complaint that occurred after his hospitalization in early 2021, including alleged assaults in August 2021." DE 39 at 21. In response, Plaintiffs (citing directly to Oquendo's SF-95, filed in the record at DE 39-2) contend that Oquendo did in fact properly present claims related to post-hospitalization conduct. *See* DE 42 at 24.

The Government relies largely on *G.L. ex rel. Lefler v. United States*, No. 3:19-cv-32-GFVT, 2021 WL 3056840 (E.D. Ky. July 20, 2021), which held that an administrative claim is preserved for future adjudication in district court "so long as the claimant provided enough specificity in the administrative claim to allow a legally trained reader to infer all potential grounds of suit." *Id.* at *2 (citing *Goodman v. United States*, 298 F.3d 1048, 1055–56 (9th Cir. 2002)). In *Lefler*, an inmate brought suit for alleged medical malpractice committed during the birth of the inmate's daughter. However, the inmate was not listed as a claimant or harmed party in the SF-95, which "clearly identifie[d] [the child] as a claimant and [the inmate] as a witness." *Id.* at *3. Thus, the court concluded that a "'legally trained reader' could not infer from the Standard Form 95 that [plaintiff] suffered injury." *Id.*

The Court notes at the outset that while both parties accept *Lefler*'s "legally trained reader" framework as the applicable standard, the Sixth Circuit has never adopted or referenced this test, and its usage among other district courts in this Circuit is limited. Setting this issue aside, Plaintiffs contend that even under *Lefler*, "Oquendo's [administrative] claim was far more specific than the claim at issue in [that case]," as Oquendo's SF-95 adequately provides a "notice or statement with the relevant federal agency containing a general description of the time, place, cause and general

nature of the injury and the amount of compensation demanded." DE 42 at 24 (quoting *Goodman*,

298 F.3d at 1055).

In his SF-95, Oquendo makes the following allegations regarding post-hospitalization

events:

> In connection with [the January 15, 2021 incident and subsequent hospitalization], Mr. Oquendo was harassed by staff, including being the target of false incident reports, comments from the staff regarding Mr. Oquendo's decision to seek counsel, and jokes about Mr. Oquendo almost being killed in the January 15, 2021 incident.
>
> Moreover, the BOP staff failed to give Mr. Oquendo proper follow-up care upon his return to the facility. Repeated requests for medical attention were largely ignored, despite Mr. Oquendo developing concerning symptoms.

DE 39-2 at 9. The SF-95 makes no other reference to any event that occurred after Oquendo's

hospitalization.

The SF-95's allegations are sufficient to adequately present Oquendo's claims. True, these

two paragraphs lack explicit details regarding either (a) the August 2021 incident involving

officers' use of OC and pepper spray, or (b) the December 2021 incident in which Oquendo was

forced to stay in a substandard cell. However, the administrative presentment requirement "is not

a particularly high bar[,]" with § 2675(a) requiring "only 'minimal notice'" of the incident giving

rise to a claim. *Abbott*, 78 F.4th at 896 (quoting *Knapp v. United States*, 844 F.2d 376, 379 (6th

Cir. 1988)). Applying this "minimal" bar, the Sixth Circuit has construed the term "incident"

broadly, finding in a post-*Lefler* decision that it includes any continuous "single course of action."

*See id.* at 899.

In *Abbott*, the plaintiff's SF-95 alleged that the National Parks Service (NPS) failed to

"monitor and extinguish a fire in the Great Smoky Mountains National Park." *Id.* at 893. Although

the SF-95 contained "no information about a failure to warn or facts related to a failure-to warn

claim," plaintiff was nonetheless allowed to bring such a claim because the SF-95 provided written notice of the incident upon which it was based, *i.e.*, "the NPS's alleged failure to deal effectively with the [f]ire, from the moment it was first spotted until the time it exploded beyond the park five days later." *Id.* at 896, 899.

*Abbott* further distinguished this finding from the Third Circuit's holding in *Roma v. United States*, 344 F.3d 352 (3d Cir. 2003). There, a firefighter's SF-95 alleged "a specific instance of negligence [in which] a particular NAES firefighter [improperly] ordered him to remove his [mask]." *Abbott*, 78 F.4th at 898 (citing *Roma*, 344 F.3d at 358). In his subsequent lawsuit, the firefighter "then attempted to use presentment of that specific instance of negligence as the basis for a wide-ranging complaint alleging negligence by the Navy in failing to prevent the fire in the first place." *Id.* at 898–99 (citing *Roma*, 344 F.3d at 363). The Third Circuit concluded that the SF-95 "did not provide any notice to the United States that it not only had to investigate the way the firefighting was handled by federal employees, but that it also had to engage in a much broader investigation concerning whether the negligence of other, non-firefighter, federal employees may have contributed to the start of the fire itself." *Roma*, 344 F.3d at 363. Thus, "*Roma* illustrates the difference between a claim for which there is inadequate notice because it is truly based on a 'different set of operative facts, is based on the acts of a different group of employees, and [ ] relies on different policies and regulations,' and, as is the case here, a claim that has a close nexus to those raised in the SF95s." *Abbott*, 78 F.4th at 898 (alteration in original) (internal citation omitted).

Here, the Court finds that Oquendo's claims all relate to a single course of abuse and mistreatment perpetuated against him by Big Sandy staff from November 2020 to December 2021. While the 2021 SHU incidents are in many ways sequentially discrete events from Oquendo's

seizures and hospitalization, they nonetheless involve the same "group of employees" (BOP officers), rely on many of the same policies and regulations, and generally share a close nexus; *i.e.*, improper, targeted abuse by a group of prison officers against a particular inmate.  Oquendo's SF-95 put the Government on sufficient notice that it needed to investigate "multiple [alleged] violations of [Oquendo's] rights and multiple torts carried out by [BOP] staff at Big Sandy."  DE 32-2 at 9.  The SF-95 further specifies that this violative conduct included post-hospitalization harassment, comments, and false incident reports by the same group of officers involved in Oquendo's seizures and hospitalization.  This is sufficient to put the Government on notice of Oquendo's August and December 2021 SHU incidents, both of which involved harassment and false incident reports, and both of which plausibly were the product of bad blood stemming from his earlier seizures and hospitalization.  This satisfies the "minimal notice" required under the statute, and the Court accordingly finds that Oquendo sufficiently exhausted his claims.

### 2.  Weekly

The Government next contends that Weekly's SF-95, also filed with the BOP in June 2022, did not present a claim for the "two assault incidents which [allegedly] took place in August of 2022 and December of 2022."  DE 39 at 21–22 (alteration omitted).  In response, Plaintiffs admit that Weekly has "since filed separate administrative claims for each of those incidents[,]" and that as a result, Plaintiffs "should be permitted to amend the Complaint to include these additional allegations as separate causes of action once fully exhausted."  *Id.* at 24–25; *see* DE 42-1 (showing Weekly did not present new SF-95 claims until after Plaintiffs had already filed the present suit in federal court).

By filing new SF-95s for each of Weekly's post-June 2022 incidents, Plaintiffs necessarily concede that claims related to these incidents have not yet been administratively exhausted.  "An

FTCA suit 'shall not be instituted' until the plaintiff 'first' presents the claim to the appropriate federal agency and the agency denies the claim." *Kellom v. Quinn*, 86 F. 4th 288, 292 (6th Cir. 2023) (quoting 28 U.S.C. § 2675(a)). A suit is "instituted" when "a new action" is "commenced," and "[a] civil action is commenced by filing a complaint." *Id.* (first quoting *McNeil v. United States*, 113. S. Ct. 1980, 1982–83 (1993), and then quoting FED. R. CIV. P. 3). Accordingly, "a plaintiff must exhaust administrative remedies before invoking the judicial process," and "[a] plaintiff who fails to comply can't cure that failure by exhausting administrative remedies while the suit is pending: the claim must be reasserted in 'a new action.'" *Id.* (quoting *McNeil*, 113 S. Ct. at 1982–83).

Thus, under this standard, a plaintiff cannot cure an unexhausted claim by later amending their complaint. As explained in *Kellom*:

> Here, the estate raised its FTCA claim in court before presenting it to DHS. Thus, after exhausting, the estate needed to dismiss its original claim and reassert it in a new action. The estate didn't.
>
> Instead, the estate amended its complaint. An amended complaint "supersedes an earlier complaint for all purposes." *Calhoun v. Bergh*, 769 F.3d 409, 410 (6th Cir. 2014) (quotation omitted). But that doesn't change the critical fact: the estate "instituted" an FTCA suit before presenting its claim to DHS. *See McNeil*, 508 U.S. at 111–12, 113 S.Ct. 1980. The estate's FTCA proceedings were premature, and the only way to cure that defect was to "commence[ ] a new action." *Id.* at 110, 113 S.Ct. 1980; *see also Duplan v. Harper*, 188 F.3d 1195, 1199 (10th Cir. 1999) (holding an amended complaint doesn't cure an exhaustion defect); *Hoffenberg v. Provost*, 154 F. App'x 307, 310 (3d Cir. 2005) (per curiam) (same).
> . . .
> In sum, the estate violated the FTCA by suing prematurely. *It didn't cure that defect by filing an amended complaint*.

*Id.* at 292–93 (final emphasis added) (citations omitted).

Because Weekly initiated the present FTCA action before administratively exhausting his claims related to staff's post-June 2022 conduct, he must reassert these claims in a new action, not

in an amended complaint.  The Court does note, however, that none of DE 23's claims, as currently alleged, rely exclusively on this conduct.

## IV.    Conclusion

For the foregoing reasons and on the terms stated, the Court **GRANTS in part** and **DENIES in part** DE 39.  Specifically, the Court:

1. **DISMISSES, in part,** Counts 10–12, to the degree these claims are premised on (a) conduct already alleged as part of Plaintiffs' assault and battery claims, (b) officers' jokes and threats, and (c) officers' false disciplinary charges.  The balance of Plaintiffs' IIED claims may proceed forward.

2. **DISMISSES** Counts 13–15 for failure to state a claim.

3. **DISMISSES** Counts 17–18 for lack of subject matter jurisdiction.

4. **DISMISSES, in part,** Weekly's claims, to the extent they are predicated on conduct occurring after June 2022.

All other claims may proceed forward at this stage.

This the 29th day of August, 2025.

Signed By:

Robert E. Wier

United States District Judge